# CUNARD STEAMSHIP COMPANY *v.* CAREY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

Argued November 8, 1886. — Decided November 15, 1886.

While A, a longshoreman in the employ of a Steamship Company, was
engaged in his regular work, a tub filled with coal fell upon him and
injured him seriously. The fall was caused by the breaking of a rope
which suspended the tub. A sued the Company to recover damages,
claiming that the injury was caused by the negligence of B in not provid-
ing a proper rope to hold the tub after notice of the insufficiency and
weakness of the one which broke, and that B was an agent of the Com-
pany; for whose acts or omissions it was responsible. The Company
defended, setting up (1) contributory negligence in A; and (2) that
B was a fellow-servant of A, for whose acts or omissions the Com-
pany was not responsible. The judge who presided at the trial refused
to direct a verdict for the Company, and referred the question of con-
tributory negligence to the jury; and also referred to them the question
as to what the authority of B was. There were various exceptions by
the Company to the charge, and to refusals to charge. A verdict was
rendered in favor of A, and judgment entered on the verdict. This court
affirms that judgment by a divided court.

Case to recover for personal injuries received by plaintiff
below (defendant in error) while in the service of defendant,
and in the performance of his ordinary duties. The evidence
was sent up with the exceptions. There was conflicting testi-
mony on some points, but the following material facts appeared
to be conceded as established, in the briefs both of plaintiff's
and defendant's counsel.

Carey, the plaintiff below, had been in the employ of the
Steamship Company for two years as longshoreman, and on
the evening of November 3d, 1880, was sent, with others, into
the hold of its steamship Batavia to assist in shifting coal from
that place to the steerage deck above. The particular work
assigned to him was that of hooking full tubs to the hoisting
apparatus, for the purpose of having them raised, and of un-
hooking empty tubs when they had descended; and his duty
required him to be stationed at the edge of the hatch, on the

Statement of Facts.

in shore side of the ship, or that nearest the dock, where all of the coal was which the men were engaged in shifting.

Two falls were in use on the hoisting apparatus, each operating a tub, one of which ascended while the other descended; and a man named Henretty was stationed in the hold, on the opposite side of the hatch to Carey, whose duties were similar to those of Carey. Each attended to the tub ascending and descending on his side of the hatch.

The rope in the falls was a spliced rope, and was part of the usual hoisting apparatus operated by steam power, and ran through various blocks attached to a derrick to a drum worked by an engine on a scow at the ship's side.

The superintendent of the dock, Storey, was not present at any time on that evening. The next person in rank to him was Patrick Craven. His relations with the company were thus described by himself when testifying as a witness in the case for defendant. "Q. What were your duties on that dock? A. To take on men and put them to work and discharge the men when I got done with them. Q. Did you hire men? A. Yes, sir; I hired all the men. Q. What were your duties with regard to the apparatus on the dock? A. To see that everything was all right for the men." About five o'clock that afternoon Craven directed Robert Graham (who was employed by the Company to take charge of rigging up the ships) to rig the falls for the purpose of hoisting up coal. Graham selected a fall from Company's storehouse, and work began.

About eight o'clock Craven, not feeling well, quit work, and at nine o'clock he left the dock. The apparatus for hoisting worked well up to the time he quit work, and when he left the dock he had had no information that anything was wrong. When he left, he left Gerraghty, the coal foreman, in charge, also an employé of the Company.

Gerraghty's relations with the Company were thus described by Craven in his testimony. "Q. In your absence who takes your place in discharging men if it is necessary, seeing to the condition of the falls and things on the dock? A. Christy Gerraghty would take the discharging and hiring of men if I was to be absent, and Robert Graham would take charge of

Statement of Facts.

·the falls. *Q.* Suppose you were both absent? *A.* I couldn't tell who it would be then. *Plaintiff's Counsel:* I understand that in the absence of Graham and Craven, Gerraghty would have full·charge? *The Witness:* Yes, sir; Christ. Gerraghty would have charge then. *Q.* Both of the men and of the gear? (No answer.) *Defendant's Counsel:* *Q.* Did Christy Gerraghty have any power to hire and discharge men independently of you?' *A.* No, sir. *Q.* No matter whether you were there or not? *A.* Well, if I wasn't there, he would have the power."

Gerraghty was called as a witness on defendant's behalf, and on this point testified as ·follows: "In chief — *Q.* As boss of the coal gang, what were your duties on the·Cunard dock in November, 1880? *A.* To look after the men and get coal removed from one hold into the other. *Q.* Did you have anything to do with the apparatus that was used in such work? *A.* No, sir. *Q.* Did you have· anything to do with buying it? *A.* No, sir. *Q.* Or keeping it in order? *A.* No, sir." "*Cross-Q.* Having charge of the gang it would· be your duty to go around and see that the men were doing their duty? *A.* Yes, sir. *Q.* And see that the apparatus was all right? *A.* That I very seldom looked after — the apparatus. *Q.* You did that night? *A.* Not until my attention was called to it. *Q.* What did you go down on the scow for? *A.* I was called down there. *Q.* Who called you? *A.* I couldn't say. *Q.* Did the man who called you state what was required of you; what was wanted of you down there? *A.* I was down in the ship's hold at the time; and some of the men overhead that was wheeling or dumping, I don't know which, perhaps one of the men that might be picking·up slack coal, told me I was wanted down on the scow to look at the·fall. I got up and went down on the scow then. *Q.* You do remember now a little bit what it was that called you out of the hold? *A.* Yes, sir; when it comes to that I do. *Q.* You went over·on the scow? *A.* Yes, sir. *Q.* Who did you see when you first got there? *A.* I couldn't exactly say which of the three men I first seen when I got in there. *Q.* Who first spoke to you? *A.* I think it was O'Brien; I am

not positive of that either; whether it was Mr. O'Brien or Jo. Redmond. *Q.* Do you recollect, without stating, what it was that was first said to you when you first got down on the scow? *A.* I think the first thing that was said to me was to look at this fall. *Q.* And you looked at it, did you? *A.* Yes, sir. *Q.* What did you do that for? *A.* To see what was the matter with it, of course. *Q.* You thought it was your duty to, didn't you? *A.* I considered it was my duty then to do it when I was sent for. *Q.* There was nobody else there that you knew of whose duty it would be to look after that fall at that time but yourself, was there? *A.* No, sir. *Q.* What part of the fall did O'Brien tell you to look at? *A.* The part which he told me to look at was on the outside of the scow at the time, and he hauled it in, and I looked at it then, and I saw the turns were worked out of the fall."

O'Brien, also an employé of the Company, was stationed that night in the scow alongside the ship. He was a witness for plaintiff, and thus described his relations with the other employés. "*Q.* How long had you been in the employ of the Cunard Steamship Company? *A.* Somewhere over a year; about a year, or somewhere about that. *Q.* During that time who was your foreman, your immediate foreman; did you have the same one at every job or different ones? *A.* The same as we had that night. *Q.* Generally speaking, did you always have the same foreman? *A.* We had Mr. Craven. *Q.* Who was he? *A.* He was the foreman and stevedore on the dock — all over. . . . *Q.* Who gave you directions from time to time in your avocation there? *A.* Sometimes Mr. Craven would give us directions, and sometimes Mr. Gerraghty would give us directions; sometimes another foreman that is there used to give us directions, owing to what work we were at. *Q.* Did Mr. Storey ever give you directions? *A.* Sometimes, yes, sir; very seldom, because he used to deliver it to his foreman. *Q.* Sometimes you got directions from Mr. Craven, I understand you? *A.* Yes, sir. *Q.* And who else? *A.* Mr. Gerraghty and another foreman that used to be there used to give us directions. *Q.* Was this other foreman there on the third of November? *A.* He was in the day there; yes, sir. *Q.*

You mean this other foreman you have mentioned whose name you have not given? A. Was he there that day? Q. Yes, sir. A. He was there in the daytime, but not that night. . . . By the Court: Q. Supposing an accident had happened to the drum, that it had been deranged, in your natural course of business what would you do? A. I would have to notify my foreman. Plaintiff's Counsel: Q. And who was that? A. That was Christy Gerraghty; we acknowledge him as such always. Q. You received your orders directly from him? A. That night, yes, sir. Q. And all your communications to a superior officer were to him? A. That night, yes, sir. Q. And that, I understand you, was the usual course of business? A. Yes, sir. Recross: Q. Do you mean to say that you always applied to Mr. Gerraghty? A. No, sir. Q. You applied to others there? A. To other foreman; he is superior and he is under sometimes; according to what we are doing."

About eight o'clock on that evening, O'Brien's attention was attracted to the worn condition of the rope. When Gerraghty came down upon the scow, O'Brien spoke to him about it. Gerraghty directed him to look out for the rope, and if the turns should come out again, to take it off and put them in. O'Brien continued to operate the rope without doing anything to it. At about half-past nine Gerraghty's attention was again called to it. He then took the fall off the drum, and put some turns in it, threw that part of it into water to steep it; and then work was resumed with it. Shortly afterwards the rope broke and the tub of coal it was hoisting fell upon Carey, who was in the hatchway beneath, and injured him seriously. He had been directed not to stand there while a load was ascending, because there was danger from falling lumps of coal which might be jostled from the tubs in their ascent.

After the evidence was in, defendant's counsel moved the court to direct a verdict for the defendant, on the grounds — first, contributory negligence of the plaintiff; second, that the evidence failed to establish negligence on the part of the defendant; and, third, that the injury was caused solely by the negligence of a fellow-servant of the plaintiff. The court denied the motion and defendant's counsel excepted.

Defendant's counsel then asked the court to make the following several instructions, each of which was refused, and to each of which refusal an exception was duly taken. The refusals as to the third and sixth requests were that the judge would not instruct the jury in the language requested, or otherwise than as the request was included in the language of the charge. As to the other requests it was absolute.

"First. That in the management and operation of the hoisting apparatus Gerraghty and O'Brien were the fellow servants of the plaintiff."

"Second. That if there was negligence on the part of O'Brien, and also of Gerraghty, in the operation of the hoisting apparatus and the use of the fall which parted, and the plaintiff's injury resulted from such negligence, or that of either of them, they being his fellow servants, he cannot recover against the defendant, whether the plaintiff was guilty of contributory negligence or not."

"Third. That O'Brien was a fellow servant of the plaintiff, and if the injury was occasioned solely by his negligence, the plaintiff cannot recover."

"Fourth. That Christy Gerraghty was, in the operation of the apparatus, a fellow servant of the plaintiff, and if the injury was occasioned solely by his carelessness in operating the apparatus, the plaintiff cannot recover."

"Fifth. That if the fall was sufficient in itself and adequate for the work when delivered to the workmen, and the injury occurred through their negligent use of it, the plaintiff cannot recover."

"Sixth. That the duty of the company to its employés is discharged when its agents, whose business it is to supply the apparatus, exercise due care in the purchase thereof, and keeping it in a reasonably safe condition for use."

"Seventh. That if when Gerraghty had put the turns in the rope and wet it, it was then in an apparently good condition and fit for use, provided it was kept from becoming untwisted, and if Gerraghty directed O'Brien to keep watch of the rope, and if the turns came out again to stop and put them in again; and if thereafter the splice of the rope drew out in consequence

of the turns coming out again, O'Brien having failed to see that they were so coming out, and by reason of such drawing of the splice the plaintiff received his injury, such injury was the result of negligence of a fellow servant, and the plaintiff cannot recover."

"Eighth. That if the plaintiff had been warned by Craven not to be under the hatch when a draught was coming up, and if the plaintiff was under the hatch when the tub in question fell on him, he cannot recover."

The following are the material parts of the charge of the court, the parts excepted to being in italics and numbered (1), (2), &c.

"The first point in the case is whether Carey contributed to the injury by any negligence of his own; for if he, by his own negligence, directly contributed to the injury, although it was caused by the negligence of another, he cannot recover. If he could, by the exercise of ordinary care on his part, have avoided the injury he cannot recover.

"I am requested to charge you, and do so, that if the plaintiff (that is, Carey) in his work failed to exercise the care and caution which a prudent man would exercise under the same circumstances, and but for which failure he would not have been injured, he cannot recover, notwithstanding the defendant was negligent.

"The negligence which it is claimed existed on his part was the standing under the hatchway when the tubs were ascending and descending, and which it is said he had been warned not to do, because it was a dangerous place. (1) *I do not understand that the defendant's superintendent, Mr. Craven, warned the workmen not to stand in the hatchway because there was danger of falling tubs, but because there was danger of falling lumps of coal, which might be jostled from the tubs in their ascent;* and the plaintiff insists that he was not under the hatchway, but on the edge of it, and just in the place where the exigencies of his work compelled him to be, and in a safe place, unless it should become unsafe by the negligence of the defendant, which the caution of the plaintiff was powerless to guard against.

"If the plaintiff is sent to work in a place where serious calamities might naturally be expected to arise, and where dangerous accidents might be naturally expected to happen, then he is called upon either not to go there or to exercise extra precaution, or else to bear unrewarded the consequences. (2) *But if he was in a safe place from any such injury unless that injury should be effected by the unforeseen and not naturally to be anticipated negligence of the defendant, then he is called upon to exercise only ordinary care.* And the plaintiff claims from the testimony of Christopher Gerraghty that the plaintiff was in no fault in standing where he did, the point being that at this time of the execution of the work, when the coal had almost all been taken from the hold, as the tub descended it became necessary to guide it to the workmen who were shovelling in the wing of the hold, and that Carey reached out his hand or stepped forward under the hatchway, took hold of the tub by the edge, and guided it to or attempted to guide it to where the shovellers were at work.

\* \* \* \* \* \*

"The next and important point in the case is whether the injury was caused by the negligence of the defendant in providing an unsafe rope or in using the rope after it had become manifestly unsafe, by its agents, to whom the duty of selecting safe appliances and controlling the use of and rejecting unsafe ones had been intrusted.

"As a general rule, the law does not impose upon employers a liability for injuries to servants which happen by the negligence of co-servants engaged in the common employment in which the injured party is engaged, although the negligent servant may be of a grade superior to that of the injured person, or his foreman in the common business.

"But the law also requires that employers shall personally exercise ordinary care in regard to the safety of the machinery and tackle which the workmen must use, and are responsible when an injury happens by the use of unsafe machinery, which the employer knew, or by the exercise of ordinary care would have known, was unsafe, and the employé did not know of the

defect from his inability to examine or know about the machinery.

"The employer is not an insurer or guarantor of safety; he (3) *is required to exercise the care which prudence requires in providing the servants with machinery reasonably and adequately safe for use by the latter.* And the employer is not bound to furnish the safest or best apparatus for the use of his workmen, nor apparatus of any particular character, nor is he obliged to maintain it up to its maximum strength. But, as I told you, he is obliged to exercise the care which prudence requires in providing the servant with machinery reasonably and adequately safe for use by the latter; and (4) *when the employer is a corporation, which acts through agents, it is responsible for the negligence of those agents who are intrusted with the duty of selecting the machinery and of exercising, after it is selected, a controlling and governing supervision and rejection when the selected machinery becomes unsafe, and they know, or ought, in the exercise of ordinary care to know, of its unsafety.*

"*For example, in the case at bar it is manifest that Mr. Craven, who says that he was the manager of the defendant's coal business at that dock, with the power of hiring and discharging men, and with the duty of seeing that the falls and appliances of this character upon the dock were right, is an agent of the character which I have described.*

\*        \*        \*        \*        \*        \*.

"It may, furthermore, in my opinion, be considered as a fact that the rope was a spliced rope, and that the injury happened by the untwisting and drawing apart of the portion of the rope which was spliced. In my opinion, gentlemen, it is so manifestly the preponderance of the evidence that this was a spliced rope, and that the injury happened by the parting of the portion which was spliced, that I do not think it is desirable to balance the testimony before you upon that point.

"The plaintiff takes two positions: First, that the rope was unsafe when selected from the storeroom; secondly, that if safe when selected, it became thereafter unsafe, and was care-

lessly permitted by Gerraghty to remain in a dangerous position.

\* \* \* \* \* \*

"I conceive that the important feature in the case is the one to which I am now coming, and that is: That the plaintiff says that if the rope was a good rope in the first place it soon became unsafe, and that its unsafety was known, or ought to have been known, by the agent, Gerraghty, to whom, in the absence of Craven, was intrusted the governing and controlling, supervising and rejection of unsafe machinery. . . . In examining this point, it is necessary to ascertain what Gerraghty's authority was.

\* \* \* \* \* \*

"The only information that we have as to Gerraghty's powers in the absence of Craven, comes from Craven and from Gerraghty himself. In Craven's presence Gerraghty is a mere foreman, with no power of discharging men or rejecting machinery. That is obvious. But what is he in Craven's absence? Craven says: "In the absence of myself and Storey, Gerraghty would have the right to hire and discharge men and look after the falls and things on the dock." Gerraghty says: "If I had thought it was necessary to put in a new rope I should have done it." •(5) *That is the only testimony upon the subject, and therefore, gentlemen, there is no need of your balancing testimony, but simply to find out, from what these two persons say, what the authority of Gerraghty was.* Well, now assuming, to use a terse expression, that he "stood in the shoes" of Craven, and that Craven was absent, let us go forward and find out what his conduct was — negligent or otherwise. If, gentlemen, he was no more than he was when Craven was present, then his knowledge is not the knowledge of the company.

\* \* \* \* \* \*

"Now, gentlemen, the plaintiff says it is manifest, from the testimony of O'Brien and Redmond, that the rope was in bad condition, and was in danger of untwisting, and that Gerraghty did not appreciate the danger, and was satisfied with simply twisting the turns, replacing the rope, and going

away; that the calamity which followed showed that the rope was in a dangerous condition by reason of untwisting or liability to untwist; and, next, that if Gerraghty's testimony is true, and he left the rope, simply saying to O'Brien if it become untwisted put the turns in, and did not return to watch it, and the calamity happened, that is Gerraghty's neglect; that the sphere of Gerraghty's duties that evening was a narrow one; that he had only to occupy himself on the scow and on the steerage deck and in the hold of the steamer; that this was not the case of an agent who is compelled to go away to a distance and to leave the work in charge of some one else; that the important duty of the hour was to see that the rope did not untwist, and that when he went away upon the vessel and did not return, content to intrust the matter to an ordinary workman, and the calamity happened through the workman's neglect, it is the fault of Gerraghty, because he had no business that night to abandon the oversight of the rope in the condition in which it was when he saw it.

"The defendant says, on the other hand, that untwisting of spliced ropes is a common occurrence in the course of this business; that there is no danger from untwisting if precautions are taken to retwist, and that when Gerraghty told O'Brien to look out for the rope and retwist it, he had intrusted a simple matter to O'Brien, which did not demand the exercise of much thought, and that Gerraghty had then done all that was his du⁓ ⁓o do.

"These are the two theories or sets of arguments which the counsel present to you, and (6) *if you think that the rope was in a good condition when it went upon the fall and thereafter became in a bad condition, which Gerraghty; then being in the shoes of Craven, and, in the absence of Craven, knew; and which he ought to have attended to himself and which he did not attend to, and the accident happened in consequence of his negligence, then the plaintiff has made out his case.* (7) *If, on the other hand, you think that Gerraghty did all that was his duty to do, and that this was a simple matter and a matter which required no care and which it was a safe thing to intrust to the*

hands of O'Brien, if he did intrust it to his hands, then another conclusion will naturally follow — that is, that he was not guilty of negligence."

In connection with exception (1) defendant's counsel requested the judge further to instruct the jury that "it was immaterial what the danger was, if the direction was that they were not to stand under the hatch." The judge refused to so charge, and counsel excepted.

Exception (3) was stated to have "reference solely to the word 'adequately' in said portion of said charge."

Exception (4) was taken "to the portion of the charge wherein the judge instructed the jury that 'Craven was an agent of the defendant, intrusted with the duty of selecting the machinery, and of exercising, after it is selected, a controlling and governing supervision, and rejection when the selected machinery becomes unsafe, and knew, or ought, in the exercise of ordinary care, to know of its unsafety.'"

Counsel for defendant further requested the judge to charge the jury: That the jury cannot draw the conclusion that from the appearance of the rope when O'Brien noticed it, it was insecure at the time when it was furnished, and that the plaintiff's claim in that respect is unfounded. But the judge refused to so charge the jury, to which refusal counsel for defendant excepted.

The jury returned a verdict against the Company for $15,000. Judgment was entered on the verdict, to review which this writ of error was sued out.

Mr. Frank D. Sturges and Mr. R. D. Benedict for plaintiff in error.

I. It was the duty of the court to direct the jury to return a verdict for the defendant on the ground that the plaintiff was guilty of contributory negligence. Railroad Co. v. Jones, 95 U. S. 439; Schofield v. Chicago, &c., Railroad, 114 U. S. 615; Pleasants v. Fant, 22 Wall. 116; Randall v. Baltimore & Ohio Railroad, 109 U. S. 478; Shanny v. Androscoggin Mills, 66 Maine, 420; Memphis, &c., Railroad v. Thomas, 51 Missis-

sippi, 637; *Lyon* v. *Detroit, &c., Railroad*, 31 Mich. 429 ; *Brown* v. *Byroads*, 47 Ind. 435 ; *Felch* v. *Allen*, 98 Mass. 572 ; *Kresunowski* v. *Northern Pacific Railroad*, 18 Fed. Rep. 229, 235 ; *English* v. *Chicago, &c., Railroad*, 24 Fed. Rep. 906, 910 ; *Cunningham* v. *Chicago, &c., Railroad*, 5 McCrary, 465, 472.

II. The court should also have directed a verdict for the defendant because the evidence failed to establish negligence on the part of the defendant. *Hough* v. *Railway Co.*, 100 U. S. 213; *Baker* v. *Allegheny Railroad*, 95 Penn. St. 211; *Marsh* v. *Chickering*, 101 N. Y. 393, 400 ; *Armour* v. *Hahn*, 111 U. S. 313.

III. The court should have directed a verdict for the defendant on the ground that the injury was occasioned through the negligence of a fellow-servant, for which the defendant is not liable. *Chicago, &c., Railway* v. *Ross*, 112 U. S. 377; *Buckley* v. *Gould & Curry Mining Co.*, 14 Fed. Rep. 833, and note; *Wood* v. *New Bedford Coal Co.*, 121 Mass. 252 ; *Brown* v. *The Winona, &c., Railroad*, 27 Minn. 162; *Hoth* v. *Peters*, 55 Wis. 405 ; *Keystone Bridge* v. *Newbury*, 96 Penn. St. 246 ; *McDermott* v. *Boston*, 133 Mass. 349 ; *McDonald* v. *Eagle, &c., M'fg Co.*, 67 Georgia, 761 ; *Yager* v. *Receivers*, 4 Hughes, 192 ; *Quinn* v. *The New Jersey Lighterage Co.*, 23 Fed. Rep. 363 ; *Hough* v. *Railway Co., supra. Crispin* v. *Babbitt*, 81 N. Y. 516 ; *Peterson* v. *The White Breast Coal Co.*, 50 Iowa, 673 ; *Mullen* v. *Steamship Co.*, 9 Philadelphia, 16 ; *Lawler* v. *Androscoggin Railroad*, 62 Maine, 463 ; *Collins* v. *Steinhart*, 51 Cal. 116 ; *Marshall* v. *Schricker*, 63 Missouri, 308.

*Mr. Hermon H. Shook* (*Mr. William C. Trull* was with him on the brief) for defendant in error.

I. Carey was guilty of no contributory negligence. The law on this point was correctly stated by the court below in its charge. *Hough* v. *Railway Co.*, 100 U. S. 213; *Railroad Co.* v. *Jones*, 95 U.S. 439; *Goodfellow* v. *Boston, &c., Railroad*, 106 Mass. 461; *Quirk* v. *Holt*, 99 Mass. 164; *Mayo* v. *Boston & Maine Railroad*, 104 Mass. 137; *Wheeloch* v. *Boston & Al-*

*bany Railroad*, 105 Mass. 203; *Bevey* v. *Central Railroad*, 40 Iowa, 564; *Brydon* v. *Stewart*, 2 Macqueen, 30; *Northern Pacific Railroad* v. *Herbert*, 116 U. S. 642, 656; *Lock* v. *Sioux City. &c.* v. *Railroad*, 46 Iowa, 109; *Gates* v. *Railroad*, 39 Iowa, 45; *Wabash Railway* v. *McDaniels*, 107 U. S. 454.

II. This accident comes within the well settled rule that the very nature of an accident may of itself, and through the presumptions it carries, supply the requisite proof of negligence. In support of this rule see Wharton on Negligence, § 441; Shearman and Redfield on Negligence, § 13; *Stokes* v. *Saltonstall*, 13 Pet. 181; *Transportation Co.* v. *Downer*, 11 Wall. 129; *Russell M'fg Co.* v. *Steamboat Co.*, 50 N. Y. 121; *Wyckoff* v. *Ferry Co.*, 52 N. Y. 32, 36; *Platt* v. *Hibbard*, 7 Cow. 497, 500, 501; *Mullen* v. *St. John*, 57 N. Y. 567; *Byrne* v. *Boadle*, 2 H. & C. 722; *Scott* v. *Dock Co.*, 3 H. & C. 596; *Feital* v. *Middlesex Railroad*, 109 Mass. 398; *McMahon* v. *Davidson*, 12 Minn. 357; *Atchison, &c., Railroad* v. *Bales*, 16 Kansas, 252; *Kendall* v. *Boston*, 118 Mass. 234; *McKee* v. *Bidwell*, 74 Penn. St. 218; *Devlin* v. *Gallagher*, 6 Daly, 494; *Cornell* v. *Railroad*, 38 Iowa, 120.

It is contended that it was the duty of O'Brien, the man stationed at the drum, to watch the rope and see that the turns did not come out, or if they did, to put them in again. Conceding, for the purpose of the argument, that such was the case, then we contend that he represented the master, as it was the master's duty to keep the rope in repair, a duty which could not be delegated to any servant of any rank or grade so as to exonerate the master. *Northern Pacific Railroad* v. *Herbert*, 116 U. S. 642; *Shanny* v. *Androscoggin Mills*, 66 Maine, 420: *Fuller* v. *Jewett*, 80 N. Y. 46; *Sheehan* v. *Railroad*, 91 N. Y. 334.

Where the master furnishes defective or inadequate machinery for use in the prosecution of his business, he is not excused by the negligence of a servant in using the machinery, from liability to a co-servant, which could not have happened had the machinery been suitable for the use to which it was applied. *Grand Trunk Railway* v. *Cumming*, 106 U. S. 700; *Cone* v. *Railroad*, 81 N. Y. 206; *Ellis* v. *Railroad*, 95 N. Y. 546; *Stringham* v. *Stewart*, 100 N. Y. 516.

Mr. Chief Justice Waite announced that the judgment of the court below was

*Affirmed by a Divided Court.*