119 U.S. 245
 7 S.Ct. 1360
 30 L.Ed. 354
 CUNARD STEAM-SHIP Co. (Limited)
v.
CAREY.[1]
 November 15, 1886.
 
 Case by Patrick Carey, defendant in error, against the Cunard Steam-Ship Company, Limited, plaintiff in error, to recover damages for personal injuries resulting to him, while in its employ, from its alleged negligence. The injuries were caused by a bucket loaded with coal, which fell upon Carey while it was being hoisted from the hold of the Batavia, one of the company's steamships, where he was working as a longshoreman in assisting to unload the vessel. At the time of the accident Carey was stationed on the shore-side of the ship, and his work was to attach tubs as soon as they were loaded to the hoisting apparatus, and to detach the tubs when they came down into the hold empty. All of the coal to be shifted was on that side of the ship. There were two falls working,—one on the side where Carey was, and one on the other side of the hatch, where another man was stationed. It was while reaching out to catch and swing over the tub on this latter fall that Carey was struck by the tub which he had just sent up. The accident was caused by the rope breaking.
 The apparatus used in hoisting the coal is thus described by one O'Brien, an employe of the company, who was in charge of part of it: 'I was engaged that night at hoisting coal; that is, at the hoisting apparatus, when we were hoisting coal. I was stationed in the scow along-side of the ship. I saw that apparatus,—that gear part of it; the part that carried away was under my eye. The way it was rigged, it was connected to a gaff or a derrick. This derrick was connected to a post or perpendicular,—a mast, like. On this gaff was lashed a block, with a hook or strap, whichever the case may be, and the fall rove through this block, and led down to the scow, and then rove through another block on the scow. Whether this rove through the third block on the ship's rail I disremember. Sometimes we used to have it rove that way, and sometimes we didn't; but it was through two blocks; I am sure of that. One block was placed on the gaff, and the other was placed on one end of the scow. Then from the block that was on the end of the scow which the fall led through it led to a drum or to a round piece of machinery that was connected to an engine, of course; and this rope was connected onto this drum. That is what it is called, or that is what we commonly call it. I don't know any other name for it. And I stood by this drum with two brakes, of which one was for hoisting up and the other for lowering. I was stationed at the drum. My duty was to go ahead with the machinery when I got the signal from the parties that was attending to the tubs in the ship's hold or deck. That signal was a piece of wood, with some pieces of iron, connected to a line, and that was rove through pulleys, and led into the scow where I could see it. The signal that night was a piece of board or wood with some pieces of iron connected to it to weigh it down. When he was ready to go ahead in the ship the man that stood at the hatch, - the hatch-tender, - he used to pull this rope, and this here piece of wood gave a jerk up, and that signified for me to go ahead.'
 At the time the accident occurred the officers of the company connected with the dock where the steam-ship lay were Storey, superintendent; next under him, Craven, foreman stevedore; and next under him, Gerraghty, second foreman or coal boss. Storey, however, was not present at that time, and Craven, being sick, left the management of the unloading to Gerraghty. The remaining facts appear from the charge of SHIPMAN, J., printed below.
 
 
 1
 At the close of the plaintiff's testimony the defendant moved for a verdict on the evidence, on the grounds (1) contributory negligence of the plaintiff; (2) failure of the evidence to establish negligence on the part of the defendant; and (3) because the injury was caused solely by the negligence of a fellow-servant of the plaintiff, viz., O'Brien. The motion was denied.
 
 
 2
 At the close of the testimony the following instructions were asked by the defendant:
 
 
 3
 [Statement of Case from pages 247-250 intentionally omitted]
 
 
 4
 '(1) That in the management and operation of the hoisting apparatus, Gerraghty and O'Brien were the fellow-servants of the plaintiff.
 
 
 5
 '(2) That if there was negligence on the part of O'Brien and also of Gerraghty, in the operation of the hoisting apparatus, and the use of the fall which parted, and the plaintiff's injury resulted from such negligence, or that of either of them, they being his fellow-servants he cannot recover against the defendant, whether the plaintiff was guilty of contributory negligence or not.
 
 
 6
 '(3) That O'Brien was a fellow-servant of the plaintiff, and if the injury was occasioned solely by his negligence, the plaintiff cannot recover.
 
 
 7
 '(4) That Christy Gerraghty was, in the operation of the apparatus, a fellow-servant of the plaintiff, and, if the injury was occasioned solely by his carelessness in operating the apparatus, the plaintiff cannot recover.
 
 
 8
 '(5) That if the fall was sufficient in itself, and adequate for the work when delivered to the workmen, and the injury occurred through their negligent use of it, the plaintiff cannot recover.
 
 
 9
 '(6) That the duty of the company to its employes is discharged when its agents, whose business it is to supply the apparatus, exercise due care in the purchase thereof, and keeping it in a reasonably safe condition for use.
 
 
 10
 '(7) That if when Gerraghty had put the turns in the rope, and wet it, it was then in an apparently good condition, and fit for use, provided it was kept from becoming untwisted, and if Gerraghty directed O'Brien to keep watch of the rope, and if the turns came out again to stop and put them in again, and if thereafter the splice of the rope drew out in consequence of the turns coming out again, O'Brien having failed to see that they were so coming out, and by reason of such drawing of the splice the plaintiff received his injury, such injury was the result of negligence of a fellow-servant, and the plaintiff cannot recover.
 
 
 11
 '(8) That if the plaintiff had been warned by Craven not to be under the hatch when a draught was coming up, and if the plaintiff was under the hatch when the tub in question fell on him, he cannot recover.'
 
 
 12
 The instructions were all refused except the third, which was given, with modifications, in the charge. The charge is as follows:
 
 
 13
 'This is an action against the Cunard Steam-Ship Company to recover damages for an injury to the plaintiff, received while in the employ of the defendant, caused, as it is alleged, by the defendant's negligence in providing unsafe and defective machinery in the work upon which the plaintiff was engaged, and which defective mc hinery, it is also claimed, directly, and without the contributory negligence of the plaintiff, inflicted the injury.
 
 
 14
 'It is substantially proved that Carey, the plaintiff, was, on November 3, 1880, a longshoreman in the employ of the defendant, and was on the evening of that day set to work, with others, in the hold of the steamer Batavia, to hoist Liverpool coal from the hold to the steerage deck. The coal was shoveled into tubs in the hold, and the loaded tubs were lifted to the deck by hoisting gear operated by steam-power. Carey's business was to attach the loaded tubs to the hoisting rope, and to detach the descending empty tubs from the hoisting rope, and to guide them to the shovelers. The rope, which was lifting a full tub, parted or broke. The tub of coal fell upon the plaintiff's leg, and caused a compound comminuted fracture. Carey was carried to the hospital, where he suffered very great pain for about five months. His life was in very great danger. He finally became a cripple for life, with a stiff knee joint, and his injured leg four and a half inches shorter than the other. The extent of the injury, the extent of his suffering, and the serious and permanent consequence of the fracture are not in dispute.
 
 
 15
 'The first point in the case is whether Carey contributed to the injury by any negligence of his own; for if he, by his own negligence, directly contributed to the injury, although it was caused by the negligence of another, he cannot recover. If he could, by the exercise of ordinary care on his part, have avoided the injury, he cannot recover. I am requested to charge you, and do so, that if the plaintiff (that is, Carey) in his work failed to exercise the care and caution which a prudent man would exercise under the same circumstances, and but for which failure he would not have been injured, he cannot recover, notwithstanding the defendant was negligent. The negligence which it is claimed existed on his part was the standing under the hatchway when the tubs were ascending and descending, and which it is said he had been warned not to do, because it was a dangerous place. [I do not understand that the defendant's superintendent, Mr. Craven, warned the workmen not to stand in the hatchway because there was danger of falling tubs, but because there was danger of falling lumps of coal, which might be jostled from the tubs in their ascent;] and the plaintiff insists that he was not under the hatchway, but on the edge of it, and just in the place where the exigencies of his work compelled him to be, and in a safe place, unless it should become unsafe by the negligence of the defendant, which the caution of the plaintiff was powerless to guard against.
 
 
 16
 'If the plaintiff is sent to work in a place where serious calamities might naturally be expected to arise, and where dangerous accidents might be naturally expected to happen, then he is called upon either not to go there, or to exercise extra precaution, or else to bear unrewarded the consequences. [But if he was in a safe place from any such injury, unless that injury should be effected by the unforeseen, and not naturally to be anticipated, negligence of the defendant, then he is called upon to exercise only ordinary care.] And the plaintiff claims from the testimony of Christopher Gerraghty that the plaintiff was in no fault in standing where he did, the point being that at this time of the execution of the work, when the coal had almost all been taken from the hold, as the tub descended it became necessary to guide it to the workmen who were shoveling in the wing of the hold, and that Carey reached out his hand or stepped forward under the hatchway, took hold of the tub by the edge, and guided it, or attempted to guide it, to where the shovelers were at work; that is, in the wing of the ship's hold in which Carey originally stood. In that part of the case the plaintiff calls your attention to the testimony of Gerraghty, when he says that it was necessary for Carey to step out under the hatch to catch the empty tub, and that if he had waited until the loaded tub went up perhaps the empty tub would have landed, and he could not get it where he wanted it. I do not think that the circumstances of this case call upon me to dwell longer upon this point.
 
 
 17
 'The next and important point in the case is whether the injury was caused by the negligence of the defendant in providing an unsafe rope, or in using the rope after it had become manifestly unsafe, by its agents, to whom the duty of selecting safe appliances, and controlling the use of and rejecting unsafe ones, had been intrusted. As a general rule, the law does not impose upon employers a liability for injuries to servants which happen by the negligence of co-servants engaged in the common employment in which the injured party is engaged, although the negligent servant may be of a grade superior to that of the injured person, or his foreman in the common business. But the law also requires that employers shall personally exercise ordinary care in regard to the safety of the machinery and tackle which the workman must use, and are responsible when an injury happens by the use of unsafe machinery which the employer knew, or by the exercise of ordinary care would have known, was unsafe, and the employe did not know of the defect from his inability to examine or know about the machinery. The employer is not an insurer or guarantor of safety. [He is required to exercise the care which prudence requires in providing the servants with machinery reasonably and adequately safe for use by the latter.] And the employer is not bound to furnish the safest or best apparatus for the use of his workmen, nor apparatus of any particular character, nor is he obliged to maintain it up to its maximum strength. But, as I told you, he is obliged to exercise the care which prudence requires in providing the servant with machinery reasonably and adequately safe for use by the latter; and when the employer is a corporation, which acts through agents, it is responsible for the negligence of those agents who are intrusted with the duty of selecting the machinery, and of exercising, after it is selected, a controlling and governing supervision and rejection when the selected machinery becomes unsafe, and they know, or ought in the exercise of ordinary care to know, of its safety.
 
 
 18
 'For example, in the case at bar, it is manifest that Mr. Craven, who says that he was the manager of the defendant's coal business at that dock, with the power of hiring and discharging men, and with the duty of seeing that the falls and appliances of this character upon the dock were right, is an agent of the character which I have described. To come nearer to the facts in the case, it is admitted that Carey did not know, and could not have known, of any defect in the rope from his station and employment.
 
 
 19
 '(I had written the following before I heard the argument of the learned counsel for the plaintiff, and I think I will read it as I wrote it originally, although it is trenching somewhat upon the positions which he took in his argument.)
 
 
 20
 'It may, furthermore, in my opinion, be considered as a fact that the rope was a spliced rope, and that the injury happened by the untwisting and drawing apart of the portion of the rope which was spliced. In my opinion, gentlemen, it is so manifestly the preponderance of the evidence that this was a spliced rope, and the injury happened by the parting of the portion which was spliced, that I do not think it is desirable to balance the testimony before you upon that point.
 
 
 21
 'The plaintiff takes two positions: First, that the rope was unsafe when selected from the store-room; secondly, that, if safe when selected, it became thereafter unsafe, and was carelessly permitted by Gerraghty to remain in a dangerous condition.
 
 
 22
 'And upon the first point the plaintiff says that a spliced rope, in being drawn through blocks, will naturally chafe, and will also naturally untwist; that this rope had been used in a fall twice after having been spliced; that it became chf ed so as to be obvious to O'Brien in an hour after he commended to use it; and that Craven knew or saw that it was a spliced rope. And the plaintiff further says that, from its condition when first examined by O'Brien, (that is, at the time which he calls eight o'clock, or supposed it was after eight o'clock, whenever it was,) it must have been defective to the eye of a person who looked at it with ordinary care when it was selected for the night's work, or that otherwise it would not have deteriorated so much.
 
 
 23
 'The fact upon which the plaintiff relies is that it did pull apart about half past ten o'clock; that O'Brien says it was chafed about eight o'clock; and that confessedly the turns were loosened when O'Brien called Gerraghty, whenever that was,—eight or nine o'clock, as the case may be; and that therefore it must have been in a visibly unsound condition at five or six o'clock.
 
 
 24
 'The defendant relies, on the other hand, upon the testimony of the storekeeper, of the rigger, and of Craven that the rope was a good one when selected; and the defendant says that the strength of the testimony is that the rope was a good rope, and would continue to have been if the turns were permitted not to have become untwisted.
 
 
 25
 'In my view of this case, gentlemen, the important point in the case is the one to which I shall now call your attention. I do not presume to decide upon this question of fact which I have just submitted to your consideration. But I conceive that the important feature in the case is the one to which I am now coming, and that is that the plaintiff says that if the rope was a good rope in the first place it soon became unsafe, and that its unsafety was known, or ought to have been known, by the agent, Gerraghty, to whom, in the absence of Craven, was intrusted the governing and controling, supervising and rejection of unsafe machinery. Now, in the first place, in examining this point, it is necessary to ascertain what Gerraghty's authority was. [Obviously, Craven was such an agent as I have described,] who had controlling authority in regard to the tackle and machinery upon the dock; and if he had been present, and had been notified of defects, and had been guilty of negligence, the liability of the company would have been plain. But it is said by the defendant that Gerraghty was a mere foreman of men, and had no more responsibility in respect to the tackle than O'Brien. It is substantially manifest that Craven was absent the latter part of the evening. Whether he was absent when this matter was first called to Gerraghty's attention is, perhaps, a matter of some doubt. If the matter was first called to Gerraghty's attention at eight O'clock, then Craven was there; if the matter was called to his attention at nine o'clock or thereafter, then Craven was not there; always provided that Craven was right in the point that he went away at nine o'clock, and not earlier.
 
 
 26
 'The only information that we have as to Gerraghty's powers, in the absence of Craven, comes from Craven, and from Gerraghty himself. In Craven's presence Gerraghty is a mere foreman, with no power of dischargine men or rejecting machinery. That is obvious. But what is he in Craven's absence? Craven says: 'In the absence of myself and Storey, Gerraghty would have the right to hire and discharge men, and look after the falls and things on the dock.' Gerraghty says: 'If I had thought it was necessary to put in a new rope I should have done it.' [That is the only testimony upon the subject, and therefore, gentlemen, there is no need of your balancing testimony, but simply to find out, from what these two persons say, what the authority of Gerraghty was.]
 
 
 27
 'Well, now, assuming, to use a terse expression, that 'he stood in the shoes' of Craven, and that Craven was absent, let us go forward, and find out what his conduct was,—negligent or otherwise. If, gentlemen, he was no more than he was when Craven was present, then his knowledge is not the knowledge of the company. The plaintiff says that the admitted danger to splicd ropes is that of untwisting, and that caution is to be used not to have them untwist. Now, gentlemen, I will turn your attention to the testimony of three persons who were present upon the scow, and who knew, or are supposed to know, in regard to this rope, viz., O'Brien, Redmond, and Gerraghty.
 
 
 28
 'O'Brien's testimony: 'I told Gerraghty that the rope looked bad, (this was, as he said, about eight o'clock;) looked as though it would not last. He told me to go ahead. He came down an hour after, and I told him that it looked worse; that I was afraid it might carry away. Whether he steeped the rope—that is, dipped the bight of the rope in water—the first time I spoke, or the last time, I don't remember. A short time after the last talk the rope broke.'
 
 
 29
 'Now, we turn to Joseph Redmond's testimony: 'Gerraghty came on the scow a little after eight o'clock. Before he came down my attention had been called to the rope. The turns were coming out of it. Nothing else was the matter at that time. O'Brien told Gerraghty that the fall was not fit for business, or something to that effect. Gerraghty told O'Brien to look out for the fall, and, if it wanted turns, to put them in. My attention, wasn't called to the fall again. It was about two hours before the accident.'
 
 
 30
 'Now we will see what Gerraghty says: 'I went on the scow that night about nine and a half o'clock. Saw O'Brien, Redmond, and Higgins. O'Brien told me: 'Look at that fall.' The part of the fall to which he referred was not then in the scow. He told me that the fall did not look very well; the turns were out of it. I saw nothing else the matter. I took the fall off the drum. I put the turns in it, and wet it to make the turns harder. I put the fall on the drum, and told O'Brien to look out for the fall, and if the turns got out to put them in. O'Brien spoke to me about the rope but once. After I left the scow after the talk with O'Brien I did not go back again that I remember. I was on the vessel. I was called to the scow to look at the fall. I think O'Brien first spoke to me. The first that was said was to look at that fall; I looked at it.'
 
 
 31
 'Now, gentlemen, the plaintiff says it is manifest, from the testimony of O'Brien and Redmond, that the rope was in bad condition, and was in danger of untwisting, and that Gerraghty did not appreciate the danger, and was satisfied with simply twisting the turns, replacing the rope, and going away; that the calamity which followed showed that the rope was in a dangerous condition by reason of untwisting or liability to untwist; and, next, that if Gerraghty's testimony is true, and he left the rope, simply saying to O'Brien if it become untwisted put the turns in, and did not return to watch it, and the calamity happened, that is Gerraghty's neglect; that the sphere of Gerraghty's duties that evening was a narrow one; that he had only to occupy himself on the scow, and on the steerage deck, and in the hold of the steamer; that this was not the case of an agent who is compelled to go away to a distance, and to leave the work in charge of some one else; that the important duty of the hour was to see that the rope did not untwist, and that when he went away upon the vessel, and did not return, content to intrust the matter to an ordinary workman, and the calamity happened through the workman's neglect. It is the fault of Gerraghty, because he had no business that night to abandon the oversight of the rope in the condition in which it was when he saw it.
 
 
 32
 'The defendant says, on the other hand, that untwisting of spliced ropes is a common occurrence in the course of this business; that there is no danger from untwisting, if precautions are taken to retwist; and that when Gerraghty told O'Brien to look out for the rope, and retwist it, he had intrusted a simple matter to O'Brien which did not demand the exercise of much thought, and that Gerraghty had then done all that was his duty to do.
 
 
 33
 'These are the two theories or sets of arguments which the counsel present to you, and [if you think that the roe was in good condition when it went upon the fall, and thereafter became in bad condition, which Gerraghty, then being in the shoes of Craven, and, in the absence of Craven, knew, and which he ought to have attended to himself, and which he did not attend to, and the accident happened in consequence of his negligence, then the plaintiff has made out his case.]
 
 
 34
 '[If, on the other hand, you think that Gerraghty did all that was his duty to do, and that this was a simple matter, and a matter which required no care, and which it was a safe thing to intrust to the hands or O'Brien, if he did so intrust it to his hands, then another conclusion will naturally follow; that is, that he was not guilty of negligence.]
 
 
 35
 'Something was said in regard to what conclusion you were to draw from the fact that the damaged rope was not in court. After suggesting to you that it is a circumstance which you are permitted to look at, I wish to say also that, in view of the fact that no suit was brought or claim made for more than a year after the accident, it is a circumstance from which, on the other hand, no injurious conclusion against the company may naturally be drawn. Now, gentlemen, in regard to the question of damages, if you come to that, there is no rule that I can lay down to you—that is, no exact rule—that can be laid down to you upon the question of damages. The plaintiff gives me a good one. In estimating the damages sustained by the plaintiff, the jury may take in consideration the pain and suffering, physical and mental, which the evidence shows he has suffered as a consequence of his injuries; also the character of the injury and its permanency, and its effect upon the plaintiff's capacity to labor and earn money in the future. All I can say to you, gentlemen, upon the matter of damages, if you come to that question, is that you are called upon to deal justly, and to give just just damages. It would not be fair for you to give damages in view of this consideration: What would I, what would you, take to go through the suffering, the pain, the chances of death, the permanent injury, which this man has gone through? Why, gentlemen, the fortunes of the richest man of you, you would not take in exchange for the probabilities of death which this man went through. You know that you would not dwell upon the subject a moment. Therefore you are to look at the matter calmly and reasonably, and give him what you consider just damages; but not extravagant, not vindictive, not exorbitant damages; but as jurors, to whom the duty of dealing between these parties is intrusted; all I can say to you is, deal justly between them.'
 
 
 36
 There was a verdict for the plaintiff for $15,000, on which, a motion for a new trial being overruled, (15 Fed. Rep. 337,) judgment was entered; and the defendant thereupon took this writ; alleging as error those parts of the charge in brackets, and the refusal of the court to give the instructions prayed.
 
 
 37
 Frank D. Sturges and R. D. Benedict, for plaintiff in error.
 
 
 38
 [Argument of Counsel from pages 256-257 intentionally omitted]
 
 
 39
 Hermon H. Shook and William C. Trull, for defendant in error.
 
 
 40
 [Argument of Counsel from pages 257-259 intentionally omitted]
 
 
 41
 WAITE, C. J., announced that the judgment of the court below was affirmed by a divided court.
 
 
 
 [1]
 Affirming 15 Fed. Rep. 337.